UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

UNITED FOOD AND COMMERCIAL,
WORKERS UNION, LOCAL 400,

     Plaintiff,

v.                              Civil Action: 2:02-0034

WEST VIRGINIA-AMERICAN
WATER COMPANY,

     Defendant

MEMORANDUM OPINION AND ORDER

     This matter is pending before the court on the parties'
respective motions for summary judgment.  The ultimate issue is
whether an underlying dispute between the parties should be
subject to binding arbitration as set forth in their collective
bargaining agreement.  For the reasons stated more particularly
below, the court answers this issue affirmatively.

I.

     The undisputed material facts demonstrate that,
effective September 12, 1997, the plaintiff union ("union") and
the defendant water company ("company") entered into a five-year
collective bargaining agreement (the "CBA").  The CBA
"recognize[d] the [union] as the exclusive bargaining

representative for all office clerical employees of the [company] employed at the [company's] Charleston office." Compl. at Ex. A, § 1.1. The CBA further defined "employee" to mean "a person in a job or position stipulated between the parties in NLRB Representation Case No. 9-RC-13257 to be within the collective bargaining unit in that case." Id. at § 1.2. The CBA governs the working relationship between the union, individual members of the bargaining unit, and the company. See id.

Section 4 of the CBA establishes an exclusive four-part grievance and arbitration procedure that governs disputes and differences among the various parties. See id. at §§ 4.1(1)-(3) & 4.2, et seq. Initially, the aggrieved member notifies his or her supervisor of the nature of the dispute and affords the company an opportunity to resolve the dispute within one business day subsequent to the initial notification.[1] See id. at § 4.1(1).

If the dispute is not satisfactorily resolved at the initial stage, the aggrieved member may present the grievance, in writing, to the union. See id. at § 4.1(2). This notification

---

[1] The company has not raised any procedural issues with the court concerning compliance, or lack thereof, by the union or its affected members with the grievance and arbitration procedure.

is part of step 2 and involves the union in the dispute for the first time.  Step 2 further requires that within five working days after the initial rejection by the grievant's supervisor, the union may submit the grievance in writing to the company's superintendent (or his designated representative) of the operation wherein the initial grievance arose.  See id.  The written grievance must set forth the basic underlying facts and the provisions of the CBA relied upon by the union.  See id.  The superintendent then has five working days to answer the grievance in writing and may either agree or disagree with the union's view, setting forth the facts and the provisions of the CBA relied upon for his or her determinations.  See id.

If no resolution is reached at the conclusion of step two, the union may appeal to the company's vice president and treasurer within seven calendar days after receipt of the step 2 rejection.  See id. at § 4.1(3).  Step 3 requires the vice president and treasurer (or his designated representative) subsequent to receipt of the appeal to meet and confer with the union in an effort to resolve the grievance.  See id.  Within seven calendar days following this meeting, the vice president and treasurer must submit to the union the company's position, in writing, either agreeing or disagreeing with the grievance.  See

id.

Only if the parties are not able to reach a collective resolution after exhausting the first three steps may the dispute be subjected to binding arbitration. In providing for these procedures, section 4.1 of the CBA prescribes as follows:

> Should any differences or disputes arise between the Company and the Union, as to the meaning, interpretation or application of this Agreement or any provision thereof, or should any controversy or trouble of any kind arise a sincere effort shall be made to settle it at the earliest practicable time through the grievance and arbitration procedure outlined below. This procedure shall be the exclusive method for the settlement of such differences, disputes or troubles during the life of this Agreement.

Id. The union "reserves the absolute right to determine the grievances to be taken to arbitration on behalf of bargaining unit employees."[2] Id. at § 4.2. Moreover, this grievance and arbitration provision is the exclusive remedy for settlement of disputes and differences between the parties, including those filed by discharged employees, "before bringing any suit or action in any court." Id. at § 4.4.

---

[2]The CBA also states "[a]t any step in this grievance procedure the Executive Board of the Local Union shall have the final authority, in respect to any aggrieved employee covered by this Agreement, to decline to process a grievance, complaint, difficulty or dispute if in the judgment of the Executive Board such grievance or dispute lacks merit or lacks justification under the terms of this Agreement to the satisfaction of the Union Executive Board." Compl. at Ex. A, § 4.6.

4

Although the grievance and arbitration provision appears expansive in scope, the parties did contract to limit the authority of the arbitrator. Specifically, section 4.3 of the CBA states:

> An arbitrator shall have only such jurisdiction and authority to interpret and apply the provisions of this Agreement as shall be necessary to the determination of the arbitrable issue; and the powers of an arbitrator shall be limited as follows:
>
> (a) He shall have no power to add to, subtract from, modify or alter in [sic] any of the terms or provisions of this Agreement.
>
> (b) He shall have no power to establish wage scales or change any wages.
>
> (c) The Company shall not be required to pay back wages for any period more than three (3) working days prior to the date a grievance is presented to the Company.
>
> (d) All awards of back wages shall be limited to the amount of wages the employees would otherwise have earned from his employment with the Company during the period or periods defined, less any unemployment compensation or compensation for personal service that he may have received from any source during such period.

Id. at § 4.3. The arbitrator may not render a decision which exceeds these restrictions. See id.

On August 24, 2000, the company announced its intention to consolidate all of its call center services, customer billing, and collection activities into one facility. See Pl.'s Mot. S.J.

5

at Exs. O & P.  At the time of this initial announcement, a decision by the company concerning the precise situs of the new consolidated centers was not communicated.[3]  See id.  However, the affected employees, including the union's members, were notified that this consolidation may detrimentally impact their present employment status with the company.  The company ultimately decided to consolidate these services at its facility in Alton, Illinois.  See id. at Def.'s Mem. Supp. Mot. S.J. at p. 2; Pl.'s Resp. to Def.'s Mot. S.J. at p. 1.

    Subsequent to the decision to consolidate these services in Alton, the union conducted negotiations with the company concerning the union's twenty-five affected members in the Charleston office.  See Pl.'s Mot. S.J. at Ex. W, pp. 13-15. Negotiations between the parties commenced in November 2000 and culminated in January 2001.  See id.; see also id. at Ex. V.  The company refers to these negotiations as "effects bargaining" and claims that an effects agreement was reached between the parties. See Def.'s Mem. Supp. Mot. S.J. at p. 2.  The union contests that it ever entered into an effects agreement, contending that it only modified the CBA with respect to one employee, Beverly

---

    [3]It is unclear from the record exactly when the company decided which situs would hold the consolidated center.

Harris.  See Pl.'s Opp. at p. 1, n.1.

As a result of those negotiations, the parties executed the "Memorandum of Understanding By and Between United Food & Commercial Workers International Union, Local No. 347 and West Virginia-American Water Company" on or about March 1, 2001 (the "Memo").  See Pl.'s Mot. S.J. at Ex. T.  The Memo concerns one of the union's affected members, Beverly Harris, who was within months of taking early retirement.  See id.  Specifically, the Memo allowed her to remain employed until her retirement vested in November of 2001.  See id.  The Memo provided that:

> Inasmuch as the Company has announced that the work performed by its associates in Charleston, West Virginia, represented by the Union is scheduled to be transferred to a new consolidated call center for the American Water Works Company in Alton, Illinois, during the second quarter of 2001, the union has requested special provisions be made for its member Beverly Harris,[] who joined the Company October 15, 1993, as a result of the Company's acquisition of the Washington Public Service District.  These provisions are a part of the severance benefits package negotiated by the Union and the Company.
>
> [specific circumstances listed pertaining to Harris]
>
> . . . .
>
> Given these circumstances, the Union has requested that the Company continue to employ Mrs. Harris through November 30, 2001, under the following precepts and conditions:
> . . . .
>
> (3)  At the conclusion of her employment, Mrs. Harris

7

will still qualify for the final severance benefits
package negotiated by the Union and the Company,
provided that Mrs. Harris is an employee of the Company
on the date that the final severance benefits package
goes into effect for the other union members.

(4)   This Memorandum of Understanding will be included
in the final severance benefits package negotiated by
the Union and the Company which is to be ratified by
the union body.

(5)   The Union will not entertain or pursue grievances,
formal or informal, by other members of this bargaining
unit regarding the Company's extension of continued
employment to Mrs. Harris, whether they relate to the
work assigned to her or the fact that she is not the
most senior employee in the bargaining unit, or for any
other reasons whatsoever.

(6) The Memorandum of Understanding is only effective
upon the Union's ratification of the final severance
benefits package.

Pl.'s Mot. S.J. at Ex. T.

The parties also negotiated the terms of a severance

package eventually offered to individual affected members.  See

Def.'s Mem. Supp. Mot. S.J. at p. 2.  On April 9, 2001, Helen B.

Lanham, the company's Director of Human Resources, sent a letter

to C. James Lowthers, president of the union, attaching the

finalized terms of the severance package, including a sample

general release to be executed by the recipient of the severance

package.[4]  See id. at Ex. V.  This letter served as confirmation
that the union's members had ratified the negotiated severance
package and was countersigned by Lowthers on May 23, 2001.  See
id.  The letter made clear that entitlement to the benefits of
the severance package would be conditioned upon the execution by
the individual recipient of a general release.  See id.  The
letter also stated that the company would give affected employees
sixty days notice prior to terminating their positions.  See id.

        The releases required the affected employees seeking
the benefits of the severance package to forego all manner of
claims, known or unknown, against the company, including claims
arising out of their employment and termination of employment.
The sample general release for employees over the age of forty
attached to the April 9, 2001 letter contains the following
provisions:

        1.  For and in consideration of the promise by (Name of
        Company) ("Company") to me, . . . Employee, his agents
        and heirs hereby irrevocably and unconditionally
        release and forever discharge Company . . . from and
        against any and all manner of actions, liability,

---

[4]There were apparently two versions of this release.  One
version applied to employees under the age of forty and one to
employees over forty.  See Pl.'s Mot. S.J. at Ex. V.  The sample
release attached to the April 9, 2001, letter was the version
pertaining to employees over the age of forty.  See id.  Copies
of the executed releases were not provided to the court by the
parties.

9

causes of action, claims, or demands, claims for personal injury, emotional distress, discrimination, and/or mental anguish, and claims and demands of every other kind and nature whatsoever, known or unknown, arising out of, existing by reason of, resulting from, or based upon: (1) any fact existing from the beginning of Employee's employment with Company to the date hereof, (2) Employee's employment with Company, or the separation therefrom, and (3) any employment practice, custom or policy of Company.

2.   The payment described above only shall be granted to Employee if he executes this General Release . . .

3.   Employee acknowledges and agrees that the claims released and discharged hereby include, but are not limited to, claims that have been asserted under: common law, Title VII of the Civil Rights Act of 1964, as amended, the American with Disabilities Act of 1964, as amended, the Civil Rights Act of 1991, the Federal Equal Pay Act, the Age Discrimination in Employment Act, including the Older Workers benefit Protection Act, the Fair Labor Standards Act, the Family and Medical Leave Act of 1993, any other federal, state or local law, constitution, regulation, ordinance, decision or common law claim concerning employment, wages, discrimination in employment, or termination of employment, any and all claims for personal injury, emotional distress, libel, slander, defamation, and other physical, economic, or emotional injury, and all claims for attorney's fees and costs.

<u>Id.</u>[5]

On March 30, 2001, the company gave notice to certain union members that their positions would be eliminated effective June 15, 2001.  <u>See</u> <u>id.</u> at Ex. S.  On April 6, 2001, the company

---

[5]The form general release was also broad.  <u>See</u> Def.'s Mem. Supp. Mot. S.J.

notified the union in writing that termination notices had been
given to fourteen of its twenty-five members.  See id. at Ex. U.
As will be seen, of the remaining eleven, ten members were
awarded "new" positions and one, Beverly Harris, received a
position as agreed, all at Charleston.  See infra at pp. 11-13.

Subsequent to their receipt of the notices, eight of
the fourteen terminated members, Sandra Dailey, Nancy McDerment,
Tennie Lawrence, Lynette Estep, Mary Castaneda, Michelle Wallace,
Jackie Payne, and Millie Gilkerson (the "Grievants"), executed
releases in order to receive their benefits under the negotiated
severance package.  See Def.'s Mem. Supp. Mot. S.J. at 3; see
also Pl.'s Resp. at p. 1.

Meanwhile, in February of 2001, the company announced
the creation of fifteen allegedly new positions, entitled field
services record clerk, and accepted requests for interviews.[6]
See Pl.'s Mem. Supp. Mot. S.J. at p. 5.  The union disputes that
these positions, which were created for the Charleston office,

---

[6]It appears that the company intended to create at least
fourteen field services record clerk positions for the Charleston
office.  The fifteenth position was given to Beverly Harris as
agreed.  See Pl.'s Mot. S.J. at Ex. T.  It is unclear whether
Harris' position would exist subsequent to November 30, 2001.
See id.  However, this issue is not material to the court's
determination.

were new or different from the positions being eliminated by the company. See Pl.'s Mot. S.J. at Ex. CC, pp. 22-23.  The union contends that most of its twenty-five members applied for these positions. See Pl.'s Mem. Supp. Mot. S.J. at p. 6.

On March 30, 2001, the company by electronic mail announced the names of the persons selected for the field services record clerk positions. See Pl.'s Mot. S.J. at Ex. R. As noted, eleven of the union's twenty-five members, including Harris, were hired.[7]  See Pl.'s Mem. Supp. Mot. S.J. at p. 6. The fourteen members who were not hired included all eight of the Grievants.[8]  Of the Grievants, Mary Castenda, Sandra Dailey, Tennessee Lawrence and Nancy McDerment were senior to all or a

---

[7]Four of the persons hired by the company for the fifteen new positions were apparently not members of the union.  See Pl.'s Mot. S.J. at Ex. R.   The eleven hired members were Evelena Williams, Kathryn Corey, Peggy Hall, Rita Bowles, Margaret Cunningham, Karen Haynes, Virginia Jones, Emily Anderson, Jodie Dorsey, Kandi Burns, and Beverly Harris.  See id. at Ex. CC, Ellis Dep. Ex. 1.

[8]In addition to the Grievants, the following six members were apparently not hired: Rita Hodges, Kimbra Clinton, Robin Thompson, Lora Thornton, William Laney, and Lea Ann Shamblin. See Pl.'s Mot. S.J. at Ex. CC, Ellis Dep. Ex.  The record demonstrates that these members did not join in signing the grievance.  The record is silent as to the reason or reasons why these members did not join in the grievance.  The record does not specifically mention that these six members accepted the severance package and signed releases.

12

majority of the eleven members, including Harris, retained by the company. See id. at Ex. CC Ellis Dep. Ex. 1. Michelle Wallace was senior to half of the members retained by the company. See id. Jacquelyn Payne and Mollie Gilkerson were senior only to two of the members retained by the company. Lynette Estep was not senior to any of the members retained. See id. [9] Assuming that the field services record clerk positions fell within the scope of the bargaining unit and that seniority was the overriding factor for purposes of filling the slots, only Grievants Castaneda, Dailey, Lawrence, McDerment, and Wallace and non-grievants Hodges and Clinton would have initially had the opportunity to fill the positions. See id.

On May 30, 2001, the Alton facility opened. See Pl.'s Mem. Supp. Mot. S.J. at p. 6. On June 5, 2001, the Grievants filed a grievance alleging that their terminations were not in accordance with section 8.7 of the CBA. See Compl. at Ex. B. Section 8.7 states that:

> Whenever it becomes necessary to reduce the work force, employees shall be laid off on the basis of seniority as defined in Section 8.1 hereof, those having the most

---

[9]It is unclear from the record whether any or all of the Grievants had more seniority or experience than the four non-union individuals hired by the company. However, clarification of this issue is not necessary to the resolution of the pending matters.

> seniority being laid off last and recalled first:
> provided that the remaining employees are qualified to
> perform the required work.

See Compl. at Ex A § 8.7.  The Grievants further claim that the

company hired younger and salaried employees to do work that

union employees had done.  See Compl. at Ex. B.

On June 7, 2001, the company through Michael A. Miller

its Vice President and Treasurer responded to the grievance by

stating that "[t]hese matters were resolved in effects bargaining

with the union and the actions taken were justified by the

management rights clause."  See Pl.'s Mot. S.J. at Ex. E.

Pursuant to step 2 of the CBA's grievance and arbitration

provision, the Grievants contacted the union.[10]

On June 12, 2001, three days prior to their termination

date, the Grievants executed their individual releases in order

to receive the benefits of the company's severance package.  See

Pl.'s Mem. Supp. Mot. S.J. at p. 7; see also Pl.'s Mot. S.J. at

Ex. H.

On June 14, 2001, and again on July 10, 2001, the union

---

[10]It appears from the record that the Grievants communicated
their claim to the union.  The record is silent concerning the
union's compliance with the remainder of step 2 of the grievance
and arbitration procedure set forth in the CBA.

wrote Miller, in an effort to schedule a meeting to discuss resolution of the pending grievance. See id. at Exs. F & G. The July 10, 2001, letter indicates that the company did not respond initially to the June 14, 2001, letter. See id. at Ex. G.

Eventually, on August 10, 2001, the parties met to discuss the grievance. See id. at Ex. H. At that meeting, the company stated its view that (1) the matter was resolved by effects bargaining, (2) the company's actions were justified under the management rights clause of the CBA, and (3) the Grievants had waived any claim stated in the grievance in exchange for benefits under their respective severance packages. See id. Subsequent to that meeting, the company reiterated its view in an August 13, 2001, letter to the union. See id.

On August 24, 2001, the union requested that the matter be arbitrated pursuant to the CBA. See Compl. at Ex. C. On September 6, 2001, the company refused the request to arbitrate and reiterated its previously asserted positions. See id. at Ex. D. On October 19, 2001, the union again requested that the underlying dispute be submitted to arbitration. See id. at Ex. E. On November 27, 2001, the company declined to do so. See Pl.'s Mot. S.J. at Ex. M.

15

On January 14, 2002, the union filed suit under 29 U.S.C. § 185 alleging that the company breached the CBA by refusing to arbitrate the underlying grievance, thereby denying the union the benefit of its bargain to arbitrate.[11]  In addition to an order compelling arbitration, the union seeks its attorney fees and costs incurred in this action.

The parties have filed cross-motions for summary judgment.  The union asserts that there is a national policy favoring arbitration applicable to labor disputes, the underlying matter is within the scope of the arbitration provision, and the company has breached the CBA.  The union apparently also contends that it retains standing to assert the collective rights of its members under the dispute resolution mechanism of the CBA regardless of any alleged waiver of its individual members' rights.

The company counters by asserting that the CBA's arbitration provision is not applicable because the underlying grievances were resolved upon the Grievants' individual

---

[11]The union also alleges that the company's actions breached the recognition clause of the CBA and breached the company's duty of good faith to deal with the union.  See Compl. at § 12. However, in its addendum clause, the union only seeks to compel arbitration of the parties' dispute and its fees and costs attendant to seeking such relief.  See id. at Addendum.

16

acceptances of the company's severance package, by reason of which the matter is not within the scope of the parties' negotiated arbitration provision.  The company further argues that the underlying claims are the sole province of the National Labor Relations Board and that jurisdiction does not lie in this court.

## II.

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Material facts are those necessary to establish the elements of a party's cause of action.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant.  Id.  The moving party has the burden of showing -- "that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 325

17

(1986).  If the movant satisfies this burden, then the non-movant must set forth specific facts as would be admissible in evidence that demonstrate the existence of a genuine issue of fact for trial.  Fed. R. Civ. P. 56(c); Id. at 322-23.  A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-moving party.  Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

Conversely, summary judgment is not appropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party.  Anderson, 477 U.S. at 248.  Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute.  Overstreet v. Kentucky Cent. Life Ins. Co., 950 F.2d 931, 937 (4th Cir. 1991).

In reviewing the evidence, a court must neither resolve disputed facts or weigh the evidence, Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir. 1995), nor make determinations of credibility.  Sosebee v. Murphy, 797 F.2d 179, 182 (4th Cir. 1986).  Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor. Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir.

18

1979).  Inferences that are "drawn from the underlying facts ...

must be viewed in the light most favorable to the party opposing

the motion."  United States v. Diebold, Inc., 369 U.S. 654, 655

(1962).

III.

A.  Jurisdiction.

     The court first addresses the company's assertion that

it lacks jurisdiction because the underlying dispute is

representational in nature.  Specifically, the company argues

that the union's underlying justifications for pursuing

arbitration consists of (1) a question about whether the newly

created field services record clerk positions are within the unit

description of the CBA and (2) whether the company made material

misrepresentations in violation of its duty of good faith and

fair dealing in effects negotiations.  See Def.'s Reply at p. 1.

The company asserts that both of these disputes are primarily

representational and, under the doctrine of pre-emption announced

in San Diego Bldg. Trades Council v. Garmon, 359 U.S. 236 (1959),

must be addressed, if at all, solely by the NLRB.  See id.

     In response, the union argues that the court has

concurrent jurisdiction over these disputes under section 301

19

and, therefore, <u>Garmon</u> pre-emption should not apply.  The union

further contends that the disputes arise under the CBA and should

be arbitrated.  Additionally, the union asserts that the

company's alleged misrepresentations in effects negotiations are

raised to challenge the validity of the releases.  <u>See</u> Pl.'s Opp.

Def.'s Mot. S.J. at p. 2.  In answering these questions the court

considers the policies behind both <u>Garmon</u> and section 301 as well

as the character of the underlying disputes.

    1.  <u>The relationship between Garmon Pre-emption and the</u>
<u>LMRA.</u>

    In <u>Garmon</u>, the Supreme Court stated:

> When an activity is arguably subject to § 7 or § 8 of
> the [NLRA], the States as well as the federal courts
> must defer to the exclusive competence of the National
> Labor Relations Board if the danger of state
> interference with national policy is to be averted.

<u>Id.</u> at 245.  The purpose of this pre-emption is "to ensure that

state law [and state and federal courts do] not frustrate either

the substantive policies established by the NLRA or the

regulatory mechanism through which those policies are

implemented."  <u>Richardson v. Kruchko & Fries</u>, 966 F.2d 153, 156

(4th Cir. 1992); <u>see also</u> <u>Amalgamated Clothing & Textile Workers</u>

<u>Union, AFL-CIO, v. Facetglas, Inc.</u>, 845 F.2d 1250, 1252 (4th Cir.

1988) ("[t]here is a strong policy in favor of using the

procedures vested in the Board for representational

determinations in order to promote industrial peace and '[t]o

fail to apply this policy to section 301 actions would allow an

end run around provisions of the NLRA under the guise of contract

interpretation.'")(quoting Local Union 204, Int'l Bhd. of Elec.

Workers v. Iowa Elec. Light & Power Co., 668 F.2d 413, 418-19

(8th Cir. 1982)).  In Richardson, the United States Court of

Appeals for the Fourth Circuit stated that:

> The general contours of the labor pre-emption doctrine
> are clear and have been settled since Garmon: The basic
> rule is that, if the conduct that the state seeks to
> regulate is "actually or arguably" protected under the
> NLRA § 7 or prohibited by NLRA § 8, then "otherwise
> applicable state law and procedures are ordinarily pre-
> empted."

Id. at 156.  The "critical inquiry" in applying Garmon is

"whether the controversy presented to the state court is

identical with that which could have been presented to the

Board."  International Longshoremen's Assoc., AFL-CIO v. Davis,

476 U.S. 380, 394 (1986).

    However, Garmon pre-emption does not necessarily extend

to an action brought under section 301 of the Labor Management

Relations Act, 29 U.S.C. § 185(a).[12]  The Supreme Court has

_____

    [12]Section 301 of the Labor Relations Management Act ("LMRA")
provides that:

21

stated:

> When an activity is either arguably protected by § 7 or
> arguably prohibited by § 8 of the NLRA, the preemption
> doctrine developed in <u>San Diego Building Trades Council
> v. Garmon</u>, 359 U.S. 236, 79 S.Ct. 773, 3 L.ed.2d 775
> (1959), and its progeny, teaches that ordinarily 'the
> States as well as the federal courts must defer to the
> exclusive competence of the National Labor Relations
> Board if the danger of state interference with national
> policy is to be averted.'  When, however, the activity
> in question also constitutes a breach of a collective-
> bargaining agreement, the Board's authority 'is not
> exclusive and does not destroy the jurisdiction of the
> courts in suits under § 301.'  This exception was
> explicitly reaffirmed in <u>Motor Coach Employees v.
> Lockridge</u>, 403 U.S. 274, 297-98, 91 S. Ct. 1909,
> 1923-24, 29 L.Ed.2d 473 (1971).  It was fashioned
> because the history of § 301 reveals that 'Congress
> deliberately chose to leave the enforcement of
> collective agreements' to the usual process of law.
> Thus, we have said that the <u>Garmon</u> doctrine is 'not
> relevant' to actions within the purview of § 301 which
> may be brought in either state or federal court.

<u>William E. Arnold Co. v. Carpenters District Council of</u>

<u>Jackonsville & Vicinity</u>, 417 U.S. 12, 15-16 (1974) (citation

---

> Suits for violation of contracts between an employer
> and a labor organization representing employees in an
> industry affecting commerce as defined in this chapter,
> or between any such labor organizations, may be brought
> in any district court of the United States having
> jurisdiction of the parties, without respect to the
> amount in controversy or without regard to the
> citizenship of the parties.

29 U.S.C. § 185(a).  The Supreme Court has held that "'[s]uits
for violation of contracts" under § 301(a) are [limited to]. . .
suits that claim a contract has been violated."  <u>Textron Lycoming
Reciprocating Engine Div, Avco Corp. v. United Auto., Aerospace &
Agric. Implement Workers of America, International Union</u>, 523
U.S. 653, 657 (1998).

omitted); see also Amalgamated, 845 F.2d at 1252 (noting that the court has concurrent jurisdiction under section 301); Lodge 1327, International Assoc. of Machinists and Aerospace Workers, AFL-CIO v. Fraser & Johnston Co., 454 F.2d 88, 90 (9th Cir. 1971) ("[n]ot covered by the [NLRA preemption] doctrine are suits brought under § 301 of the LMRA such as this one."); Holland v. Cline Brothers Mining Co., Inc., 877 F. Supp. 308, 312 (S.D. W. Va. 1995) (holding that the court had concurrent jurisdiction over a claim which could constitute both an unfair labor practice and a violation of the operative collective bargaining agreement).

The Fourth Circuit has held that jurisdiction under section 301 is precluded if the contractual dispute is primarily representational. See Amalgamated, 845 F.2d at 1252. In United Food & Commercial Workers Union, Local 400 v. Shoppers Food Warehouse Corp., 35 F.3d 958 (4th Cir. 1994), the Fourth Circuit stated:

> It should be noted that, as in this case, the decision is often not just between arbitration and no arbitration but rather between arbitration and a potential, or prior, resolution by the NLRB. This issue repeatedly crops up because of the overlapping jurisdiction created when the same incident or dispute leads to an unfair labor practices claim before the NLRB and a § 301 action in federal court. We address this issue further below, noting now that courts generally have allowed arbitration to proceed unless a dispute is so "primarily representational," that it falls solely within the [NLRB's] jurisdiction.

23

Id.

2.    The Dispute is Not Primarily Representational.

The company argues that the dispute between the parties is primarily representational in that it focuses on core issues (representation and misrepresentations in bargaining) reserved exclusively for the NLRB.  The union responds that this civil action is brought pursuant to section 301 of the LMRA and is not primarily representational but relates to a valid CBA.

Undisputedly, an arbitration provision may be enforced by filing suit under section 301.  See Textile Workers v. Lincoln Mills, 353 U.S. 448, 456-57 (1957); see also United Steel Workers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 577-78 (1960) ("a grievance provision in collective agreement could be enforced by reason of § 301 of the Labor Management Relations Act."); Cumberland Typographical Union No. 244 v. The Times and Alleganian Co., 943 F.2d 401, 404 (4th Cir. 1993) ("[i]f the court determines that the matter in dispute is a matter designated for arbitration by the parties in their contract, section 301(a) of the LMRA allows the specific enforcement of the arbitration agreement.").  The question for the court is whether the matters underlying the action to arbitrate are so primarily

representational that they must be resolved by the NLRB.  For the
reasons that follow, the court concludes that neither matter
identified by the company as underlying the union's action for
arbitration is so primarily representational as to necessitate
resolution by the NLRB.

In <u>United Brotherhood of Carpenters and Joiners of
America, Local Union No. 1694 v. W.T. Galliher & Brothers, Inc.</u>,
787 F.2d 953 (4th Cir. 1986), the Fourth Circuit affirmed a
district court order compelling arbitration of a dispute
concerning whether one hourly door shop employee was part of a
unionized work force.  <u>See id.</u> at 955.  The court acknowledged
that the dispute was arguably representational but stated:

> we believe that the district court properly ordered
> arbitration under section 301.  In <u>Carey v.
> Westinghouse Electric Corp.</u>, 375 U.S. 261, 84 S. Ct.
> 401, 11 L.Ed.2d 320 (1964), the Supreme Court faced a
> similar dispute that could have been characterized as
> either representational or contractual.  The Court
> ordered arbitration, which would resolve the dispute,
> if upon close inspection, it was a contractual question
> covered by the collective bargaining agreement.  Even
> if the question ultimately was not covered by the
> collective bargaining agreement and was, therefore, not
> arbitrable, the Court believed that arbitration might
> have a "pervasive, curative effect."  If the dispute
> persisted after arbitration, the NLRB would be free to
> give the arbitrator's decision no more than its
> appropriate weight when the case finally came before
> the Board.  <u>Carey</u> comports with Congress's intent to
> resolve disputes through arbitration whenever possible
> and <u>Carey</u>'s reasoning should be followed in the case at
> bar.

25

Id. at 954.  The court further noted that (1) the case was not primarily representational; (2) the case was not invoked to circumvent a prior Board determination; (3) the case was not brought because both parties deliberately avoided the NLRB to undermine employee self-determination; and (4) the case was not one over which the NLRB had assumed jurisdiction.[13]  See id.  The court also determined that the intent of the parties and the duties of the door shop employee were issues to be determined by the arbitrator.  See id. at 955.

The issue of pre-emption in the context of a section 301 suit to compel arbitration was further addressed in Shoppers Food, 35 F.3d 958, where the Fourth Circuit affirmed a district court order granting summary judgment to the union and compelled arbitration of a dispute concerning the application of a new store clause.  See id. at 958-59.  During the pendency of the appeal, the NLRB ruled that the employer's refusal to apply the parties' CBA to the new shop in question did not constitute an unfair labor practice.  See id. at 962.

---

[13]The record in this matter indicates that neither party has sought to involve the NLRB and the NLRB has not exercised jurisdiction.  There is nothing in the record to suggest that the parties are avoiding the NLRB to undermine employee self-determination.

In affirming the district court's order compelling arbitration, the court noted that enforcement of an arbitration provision recognizes "'the central role of arbitration in our system of industrial self-government.'" Id. at 960 (quoting Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 219 (1985). In addressing whether the dispute presented was primarily representational, the court concluded that the new shop provision was within the scope of the parties' arbitration provision and the relevant precedents allowed for arbitration of the new shop dispute. See id. at 961. The court further concluded that arbitration was not precluded by the NLRB's prior determination because of the possibility that the "outcomes of the underlying dispute an arbitrator could reach would not conflict with either NLRB policy or its specific determination here." Id. at 963.

Turning to the parties' disputes, Section 1.1 of the CBA states that:

> The Company recognizes the Union as the exclusive bargaining representative for all office clerical employees of the Employer employed at the Employer's Charleston office, in Charleston, West Virginia; but excluding all technical, professional and confidential employees, all other employees, and all guards and supervisors as defined in the National Labor Relations Act.

Compl. at Ex. A, § 1.1.  Section 1.2 states that:

> For the purpose of this Agreement, the term "employee"

27

> shall mean, unless otherwise specifically stated, a
> person in a job or position stipulated between the
> parties in NLRB Representation Case No. 9-RC-13257 to
> be with the collective bargaining unit in that case and
> described in Section 1, above.

Id. at § 1.2.  Construing these two clauses together, the court

concludes that the parties did intend to define the scope of the

bargaining unit within the context of the CBA.  Thus, the scope

of the bargaining unit is a negotiated term contained within the

provisions of the CBA and, as such, is subject to the CBA's

grievance and arbitration provision.

        In McDonnell Douglas Corp., 59 F.3d 230 (D.C. Cir

1995), the District of Columbia Circuit Court noted that:

> The Board has never suggested that a union and employer
> cannot contractually bind each other as to the scope of
> the bargaining unit.  In fact the Board remarked in
> this very case that it has a policy of encouraging
> unions and employers to enter into such agreements.

Id. at 234.  Courts have held that the scope of a representation

clause contained within a CBA can be the subject of

arbitration.[14]  See International Brotherhood of Electric

---

[14]The company cites Amalgamated in support of its position.
In Amalgamated, the Fourth Circuit held that the plaintiff union
could not bring claims under section 301 concerning breaches of a
purported wage agreement with the defendant employer until it was
first determined that the plaintiff had won an election.  See
Amalgamated, 845 F.2d at 1253.  That is, the parties' CBA
containing the wage agreement would not be effective unless the
plaintiff won the disputed election.  See id.  Amalgamated is
thus distinguishable from this case in that the matter before the

Workers, Local 134, AFL-CIO v. Chicago Zone of Marketing

Operations of GE Co., 535 F. Supp. 16, 20-21 (N.D. Ill. 1981)

("Bargaining unit status is to be determined by construing the

Union recognition clause of the collective bargaining agreement.

This is an arbitrable duty pursuant to the arbitration clause.");

see also Bell Cold Storage, Inc. v. Over-The-Road Transfer, Cold

Storage, Grocery & Market Drivers, Helpers & Inside Employees

Union, Local No. 544, 885 F.2d 436, 439 (8th Cir. 1989)

("[n]otwithstanding the delegation of authority to the Board in

bargaining unit determinations, certain representational issues

can be the subject of arbitration where the collective bargaining

agreement provides for mandatory arbitration."); cf. NLRB v.

Greensburg Coca-Cola Bottling Co., Inc., 40 F.3d 669, 674 (3rd

Cir. 1994) (noting that interpretation of the recognition clause

may be subject to arbitration).

Even if the company is correct that the underlying

dispute ultimately concerns whether the newly created field

services record clerk positions are within the scope of the

bargaining unit, the court, under the holdings in Galliher and

_____

court involves a relationship defined by an executed CBA.  The
parties' dispute arguably arises under the provisions of that
CBA.  Because interpretation of those provisions is necessary for
resolution of the dispute, arbitration is proper.

Shoppers Food, concludes that the parties, having freely
negotiated to include a representation clause in their operative
CBA, intended issues of interpretation about the scope of the
bargaining unit to be within the authority of the arbitrator.
Inasmuch as those contractual issues are not primarily
representational matters, the company may not on that ground
refuse to arbitrate.

Similarly, the court rejects the company's argument
that the union's allegations of misrepresentation must be
resolved by the NLRB. Whether the alleged misrepresentations
were made and, if so, whether they materially affected the
position of the union or the Grievants in negotiations for, or
execution of, the releases are inquiries that may bear upon
resolution of the disputed issue of whether the union or the
Grievants modified their respective rights under the CBA. Thus,
the issue of misrepresentation may not be neatly severed from
that of contract interpretation.

Consequently, the court concludes that the underlying
dispute is not pre-empted by the NLRA.

B.  Arbitrability.

The company also challenges this section 301 action by asserting that the underlying dispute is not arbitrable under the CBA's grievance and arbitration procedure.  Specifically, the company argues that the underlying grievances were terminated by the union's ratification of the company's severance package and release and the Grievants subsequent individual execution of the releases.

   1.  The Court Determines the Threshold Question of
       Arbitrability in the Absence of a Clear and
       Unmistakeble Provision to the Contrary.

Arbitration plays a critical role in the furtherance of labor-management relations.  See Warrior & Gulf, 363 U.S. at 578 ("[in the context of a collective bargaining agreement], arbitration is the substitute for industrial strife."); see also Tobacco Workers Intern'l Union, Local 317 v. Lorillard Corp., 448 F.2d 949, 957 (4th Cir. 1971) (noting that arbitration furthers the primary goal of labor law to avoid industrial strife). Arbitration in collective bargaining has long been recognized as a preferred method of dispute resolution.  See AT&T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 648 (1986); see also Local Union No. 637, Intern. Botherhood of Elec.

31

Workers, AFL-CIO v. Davis H. Elliot Co., 13 F.3d 129, 132 (4th
Cir. 1993) ("it is also firmly established that courts will
broadly construe contractual provisions for arbitration because
of the well-recognized benefits of peaceful resolution of labor
disputes through arbitration.").  Because of the role arbitration
plays within the context of labor negotiations, there exists a
presumption of arbitrability that doubts should be resolved in
favor of arbitration.  See AT&T Technologies, 475 U.S. at 650;
see also Warrior & Gulf, 363 U.S. at 582-83 ("[a]n order to
arbitrate the particular grievance should not be denied unless it
may be said with positive assurance that the arbitration clause
is not susceptible of an interpretation that covers the asserted
dispute.  Doubts should be resolved in favor of coverage.").

    Nevertheless, "[w]hile arbitration serves important
public interests, an agreement to arbitrate -- like any other
contract -- is fundamentally about private choice."  Carson v.
Giant Food, Inc., 175 F.3d 325, 328 (4th Cir. 1999).  A court has
no authority to require a party to submit to arbitration a
dispute which that party had not agreed to submit.  See Warrior &
Gulf, 363 U.S. at 582 ("arbitration is a matter of contract and a
party cannot be required to submit to arbitration any dispute
which he has not agreed so to submit."); see also International

32

Brotherhood of Elect. Workers, Local 26, v. Advin Electric Inc., 98 F.3d 161, 164 (4th Cir. 1996) ("[i]t is firmly set law that the obligation to arbitrate is a creature of contract, and a party cannot be required to submit to arbitration unless he has agreed to do so.") Davis H. Elliot Company, 13 F.3d at 132 ("Because the right to compel arbitration is contractual and consensual, courts enforce arbitration of only those disputes to which the parties have previously agreed."). Whether the parties have agreed to arbitrate a dispute is a matter of contract interpretation. See Cumberland Typographical, 943 F.2d at 404.

Although the question of arbitrability involves contract interpretation -- a province usually reserved for the courts -- the parties may by contract assign the duty to make the arbitrability determination directly to the arbitrator. See Carson, 175 F.3d at 329 ("parties can agree to let an arbitrator determine the scope of his own jurisdiction."). However, absent clear and unmistakable language to the contrary the court, not the arbitrator, is the gatekeeper of the substantive question of arbitrability. See Cumberland Typographical, 943 F.2d at 404; see also AT&T Technologies, 475 U.S. at 649 ("Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the

33

court, not the arbitrator.").

Reviewing the CBA, the court concludes that the parties did not intend for the arbitrator to determine the threshold issue of whether a dispute is arbitrable. Section 4.3 of the CBA specifically limits the arbitrator's authority to "only such jurisdiction and authority to interpret and apply the provisions of this Agreement as shall be necessary to the determination of the arbitrable issue." Compl. at Ex. A, § 4.3. By its express language, this provision indicates the parties' intention that the CBA limits the arbitrator's authority to determination of the arbitrable issue. See id.

Moreover, while the parties' grievance and arbitration provision found in section 4.1 is quite broad, committing to arbitration "any differences or disputes [that] arise . . . as to the meaning, interpretation or application of this Agreement," it does not evidence a clear and unmistakable intent of the parties to imbue the arbitrator with authority to determine the threshold issue of substantive arbitrability. See Carson, F.3d at 329–330 (declining to permit arbitrator to determine arbitrability and observing that "broad arbitration clauses that generally commit all interpretive disputes "relating to" or "arising out of" the agreement do not satisfy the clear and

34

unmistakable test."). Here, it is for the court, not an arbitrator, to determine whether the underlying dispute comes within the scope of the applicable arbitration provision.

### 2. The Dispute Is Arbitrable.

In First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938 (1995), the Court stated that "[w]hen deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." Id. at 944. The Fourth Circuit has stated that:

> [I]t is also firmly established that courts will broadly construe contractual provisions for arbitration because of the well-recognized benefits of peaceful resolution of labor disputes through arbitration. If it cannot be said "with positive assurance" that a dispute is excluded from arbitration by a contract's arbitration clause, the doubt should be resolved in favor of an interpretation that submits the dispute to arbitration.

Davis H. Elliot Co., 13 F.3d at 132; see also East Coast Hockey League, Inc. v. Professional Hockey Players Assoc., 323 F.3d 311, 314 (4th Cir. 2003) ("[A] court should uphold a claim that a dispute is subject to arbitration 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'") (quoting AT&T Techs., 475 U.S. at 650). While the court is bound

35

to look at the terms of the parties' contract, it is also "well settled law that federal policy favors arbitration of labor disputes, and that a presumption of arbitrability is to be applied in cases of ambiguity or doubt." <u>Lynchburg Foundry Co. v. Patternmakers League of N. Am.</u>, 597 F.2d 384, 386 (4th Cir. 1979) (internal quotations omitted). Yet, the court may not in its consideration of arbitrability base its decision on the merits of the parties' positions in the underlying dispute. <u>See Shoppers Food Warehouse Corp.</u>, 35 F.3d at 961 ("An important corollary to the 'presumption' is that the judicial function is merely to consider whether to enforce the arbitration clause, not to assess the relative merits of the underlying dispute."); <u>see also Tobacco Workers International Union</u>, 448 F.2d at 954 n. 10 ("[t]he Supreme Court has expressly rejected the notion that a federal court could refuse to compel arbitration because it felt the claim to be frivolous.").

The record does not demonstrate with the requisite positive assurance that the applicable grievance and arbitration provision is not susceptible of an interpretation or application that covers the asserted dispute. As earlier noted, the parties' grievance and arbitration provision broadly provides that:

> Should any differences or disputes arise between the Company and the Union, as to the meaning,

> interpretation or application of this Agreement or any
> provision thereof, or should any controversy or trouble
> of any kind arise a sincere effort shall be made to
> settle it at the earliest practicable time through the
> grievance and arbitration procedure outlined below.
> This procedure shall be the exclusive method for the
> settlement of such differences, disputes or troubles
> during the life of this Agreement.

Compl. at Ex. A § 4.1.  The CBA thus specifies that the

arbitrator has jurisdiction to decide disputes between the

parties concerning the meaning, interpretation, or application of

the CBA or any of its provisions and to arbitrate "any

controversy or trouble of any kind."    See id.

        The language employed governs not only disputes

arising from the specifics of the CBA but also touches upon

disputes arising from the existence of the relationship between

the parties.  The restrictions set forth within the CBA simply

serve to prevent the arbitrator from ignoring the expressed

intent of the parties or curtail the amount and nature of the

relief the arbitrator may award.  While the court concludes that

the general restriction set forth in section 4.3(a) of the CBA

prevents the arbitrator from imposing a result, interpretation,

or obligation under the CBA that the parties never mutually

intended, section 4.3(a) does not restrict the arbitrator from

determining the parties' intent and applying that intent to

resolve a dispute under the CBA.

37

i.  Waiver.

Without adjudicating the merits of the underlying disputes, the court finds that, as framed in the record, these disputes do fall within the scope of the CBA's grievance and arbitration provision.  Whether the union affirmatively waived its right to arbitrate presents the closest question.

The company argues that the union, by ratifying the severance package and release, in essence waived its rights under the CBA.  See Def.'s Reply to Pl.'s Resp. in Opp. at pp. 2-3.  In support of that contention, the company relies in part upon the language in the Memo which indicates that the Harris agreement was contingent on the union's acceptance of the terms of the severance package.  See Pl.'s Mot. S.J. at Ex. T.  The company relies as well on its April 9, 2001, letter from Helen Lanham to the union seeking confirmation that the union had in fact ratified the severance package.  See id. at Ex. V.  It is undisputed that this letter was countersigned by the union on or about May 23, 2001.  Additionally, the Grievants all executed releases of their individual claims.  See supra Part I at pp. 13-14.  Thus, the company asserts that the undisputed facts constitute an unmistakable affirmative waiver by the union of its arbitration rights under the CBA.

However, the court is not persuaded with the requisite positive assurance that the presented facts renders the dispute insusceptible of arbitration.  The question of whether the parties entered into a valid modification of the CBA necessitates an inquiry under section 20.1.[15]  The union maintains that it never entered into a signed written agreement as required by section 20.1 to modify, alter, amend, or terminate its arbitration rights.  See Pl.'s Opp. to Def.'s Mot. S.J. at pp. 2-3.  The union further asserts that its collective rights are separate from, and independent of, the individual rights of its members.  See id. at 4.  Finally, the union attacks the very validity of those releases by claiming that they were procured by the company only through the use of material misrepresentations. See supra at p. 30.  Whether the parties intended to modify or alter the CBA to extinguish the union's collective rights is a

---

[15]Section 20.1 of the CBA provides:

This Agreement constitutes the entire agreement between the parties; and it may be altered, amended or supplemented by an agreement in writing signed by the authorized representatives of the Union and the Company.  Any such duly authorized supplemental Agreements or Memoranda of Understanding shall be considered a part of this Agreement in the same manner as if incorporated herein, and shall continue in force and effect until the expiration date of this Agreement.

Compl. at Ex. A, § 20.1.

39

factual question requiring resolution by an arbitrator in the course of interpreting the CBA.[16]  Accordingly, the court finds the disputes presented are arbitrable.

### ii.  Arbitrable Issues.

Having determined that the company's defense of waiver involves questions of contract interpretation under the CBA and having concluded that such questions should be addressed by the arbitrator, the court addresses the scope of the parties arbitrable disputes.  The disputes outlined by the parties in their briefing and set forth in detail below are all susceptible to arbitration because resolution of such questions is contingent on either the interpretation or application of one or more provisions of the CBA, including the representation provisions (sections 1.1 and 1.2), the grievance and arbitration provision

---

[16]The court does not pass on the company's defenses of waiver or justification.  Instead, the court finds that the arbitrator, not the court, should decide those issues.  It is conceivable that the arbitrator may (or may not) conclude, based on the facts presented, that the union did effectuate a waiver by its actions in negotiations or that the actions of the Grievants in signing the releases terminated the union's interest in the grievance.  By this order, the court merely concludes that those determinations are matters of contractual interpretation under the CBA and that the parties, by the language employed in the CBA, intended such matters to be resolved by the arbitrator and not the court.  The issues of waiver as framed by the company in its motion for summary judgment may be presented to the arbitrator.

(Article 4), the management rights provision (Article II), the integration provision (section 20.1), and the seniority provision (Article 8).  The record demonstrates that the parties' disputes involve the following arbitrable issues:

> 1.  Whether the union waived its right to arbitrate under the CBA by entering into a valid modification agreement.
>
> 2.  Whether the Grievants waived their rights under the CBA by entering into a valid release.
>
> 3.  If in fact the Grievants did waive their rights under the CBA, whether the union has independent standing under the grievance and arbitration provision to continue to prosecute the grievance.
>
> 4.  Whether the field services records clerk positions are within the scope of the representation provision contained in the CBA.
>
> 5.  Whether the company was justified under the management provisions in taking its action to eliminate the positions.
>
> 6.  Whether the company breached the seniority provisions of the CBA.

The answer to one or more of these questions may be dispositive of the entirety of the dispute.  The court by this opinion does not express a view on the merits of the parties' positions concerning any of these questions.  Rather, in accordance with the parties' expressed grievance and arbitration provision, the court places responsibility to resolve these disputed questions in the hands of the arbitrator.

C.   The Union's Request for Attorney Fees.

In addition to an order compelling arbitration, the union seeks an award of its attorney fees expended in prosecuting this lawsuit.  Addressing a company's request to vacate an arbitrator's award, the Fourth Circuit has observed that

> Neither the collective bargaining agreement between Marval and the Union nor § 301 of the Labor Management Relations Act, under which this action was brought, provides for an award of attorney's fees to a prevailing party.  Without such express contractual or statutory authorization, courts generally adhere to the American Rule which requires each party to bear its own litigation costs, including attorney's fees.  This general rule is subject to several narrow exceptions, however, that derive from the courts' historic equity powers.

United Food and Commercial Workers, Local 400 v. Marval Poultry Co., Inc., 876 F.2d 346, 350 (4th Cir. 1989)(internal citations omitted).  The court ultimately found that attorney fees and costs may be awarded in a section 301 action where the party's position was "without justification."  Id.  Although this case, unlike Marval Poultry, involves a request for fees in the context of a refusal to arbitrate, the "without justification" standard articulated in Marval Poultry appears to be applicable.  Indeed, when addressing requests for attorney fees and costs associated with a motion to compel arbitration under section 301 other circuit courts of appeal have applied the "without justification"

42

standard in motions seeking to compel arbitration under section 301.  See Local 285, Service Employees Intern. Union, AFL-CIO v. Nonotuck Resource Associates, Inc., 64 F.3d 735 (1st Cir. 1995); Chauffeurs, Teamsters & Helpers v. Stroehmann Bros., 625 F.2d 1092 (3rd Cir. 1980); United Food & Commercial Workers Union v. Alpha Beta Co., 736 F.2d 1371 (9th Cir. 1984); but cf. Local 232, Allied Industrial Workers of America, AFL-CIO v. Briggs & Stratton Corp., 837 F.2d 782 (7th Cir. 1988)(applying bad faith standard in declining to award fees to a union who had successfully compelled arbitration under section 301).

The court is unable to conclude that the company acted without justification in resisting arbitration and, accordingly, no sufficient basis has been shown to require the company to bear the union's fees and costs.

IV.

For the reason set forth herein, the union's motion for summary judgment is granted and the company's motion for summary judgment is denied.

It is, accordingly, ORDERED that this matter be submitted to arbitration.  It is further ORDERED that the parties bear their own costs and fees incurred in this action and this

43

action be, and it hereby is, stricken from the docket of this court.

The Clerk is directed to forward copies of this memorandum opinion and order to all counsel of record.

DATED: September 29, 2006

John T. Copenhaver, Jr.
United States District Judge